764 F.Supp. 1543 (1991)
Issiah ROSS, Jr., William Morgan Porter, Johnnie Lee Palms, James C. Homer, John W. Taylor, Vernon Alexander Putman, Hosey J. White, Jr., Franklin Roosevelt Scott, Gerry Plant, Tabitha Herring, Eddie Slaughter, Plaintiffs,
v.
BUCKEYE CELLULOSE CORP., Defendant.
Civ. No. 86-048-ALB/AMER(DF).
United States District Court, M.D. Georgia, Albany/Americus Division.
June 4, 1991.
*1544 *1545 *1546 James Finkelstein, Albany, Ga., for plaintiffs.
John G. Skinner, Robert N. Godfrey, Smith, Currie & Hancock, Atlanta, Ga., for defendant.
FITZPATRICK, District Judge.
In an order issued by the court in the above styled case on August 11, 1989, 733 F.Supp. 344 (hereinafter referred to as Buckeye I), the court determined that defendant's Pay and Progression System was a discriminatory employment practice that had a ongoing disparate impact on blacks employed at Buckeye Cellulose Corporation (Buckeye). On April 2, 1990, 733 F.Supp. 363, the court concluded the second phase of this case, (hereinafter referred to as Buckeye II), by rendering its individual findings of facts and conclusions of law concerning defendant's liability to the individual plaintiffs arising from their disparate impact claim. The court will now complete the final phase of this action by determining herein the damage award each prevailing plaintiff in this case is entitled to receive and by ruling on plaintiffs' request for attorney's fees. Defendant would also have the court revisit the issue of whether or not plaintiffs' filed their charges against the defendant in a timely manner. The court, however, will not reexamine that issue and instead stands by its earlier ruling rendered in Buckeye I.

I. DAMAGES
In awarding damages to the prevailing plaintiffs (hereinafter plaintiffs), the court must attempt to place each one in the position he or she would have been in absent defendant's discriminatory practices. Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The means of accomplishing that goal in this case is to award back pay and other equitable relief, which the plaintiffs in this case are entitled to receive based on the court's finding that they are victims of defendant's discriminatory Pay and Progression System. Id. at 418-19, 95 S.Ct. at 2372. Interest, overtime, shift differentials, and fringe benefits such as vacation pay, sick pay and profit sharing are all components of back pay that are to be included in the computation of such an award, if applicable. See Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1562 (11th Cir.1986). The back pay awarded should equal the amount the party would have received had there been no discrimination less the pay he or she actually collected as a result of the defendant's discriminatory actions. Moody, 422 U.S. at 418-19, 95 S.Ct. at 2372.
An award of back pay damages also entitled the recipient to receive prejudgment interest on the damage award computed in accordance with the prevailing IRS prime rates. See EEOC v. Guardian Pools, Inc., 828 F.2d 1507, 1512 (11th Cir. 1987); Smith v. American Service Co. of Atlanta, Inc., 796 F.2d 1430, 1432 (11th Cir.1986). All plaintiffs receiving back pay damages in this action will therefore be granted prejudgment interest on the amount of back pay awarded each year as computed by the clerk of court based on the prevailing IRS prime rates. Further *1547 equitable relief appropriate in this case is the placement of plaintiffs currently employed at Buckeye on the same pay scale they would have been on but for the discriminatory practices of Buckeye. See International Brotherhood of Teamsters v. United States, 431 U.S. 324, 364, 97 S.Ct. 1843, 1869, 52 L.Ed.2d 396 (1977).
Determining the amount of back pay that should be awarded to the plaintiffs in this case will require the court to "recreate the employment history of the individual victims and hypothesize the time and place of each employee's advancement absent the unlawful practice." Myers v. Gilman Paper Co., 527 F.Supp. 647, 649-50 (S.D.Ga.1981) (citing International Brotherhood of Teamsters, 431 U.S. at 372, 97 S.Ct. at 1873). In doing so, "unrealistic exactitude is not required, [and] uncertainties in determining what an employee would have earned but for the discrimination, should be resolved against the discriminating employer." Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 260-61 (5th Cir.1974). The court will engage in an imprecise process that will necessarily require a certain amount of estimation. International Brotherhood of Teamsters, 431 U.S. at 372, 97 S.Ct. at 1873. A process made even more difficult by the fact that the very nature of defendant's discriminatory practice was the systematic, ongoing failure of Buckeye to fairly appraise, examine, qualify, and reward the plaintiffs. The calculation of back pay damages in this case, however, is by no means an impossible task that will force the court to engage in mere speculation.
The court heard months of testimony in this case which has allowed it to piece together an accurate picture of the competence, intelligence, and skill of each of the plaintiffs in comparison with their fellow workers and to determine how those attributes would have resulted in their advancement in a work place such as Buckeye's absent discriminatory practices. Mindful of those findings and aided by thousands of pages of records, transcripts, and exhibits, the court will determine the damages each plaintiff is entitled to receive based on its finding that they were injured by Buckeye's discriminatory Pay and Progression System.
In computing back pay damages in this case, the court first determined each plaintiff's actual average annual hourly rate and the actual hours that plaintiff worked each year. The court then determined the average annual hourly pay rate of a similarly situated white technician. Using that data, the court projected the annual salary plaintiff would have earned absent defendant's discriminatory practices by multiplying the average annual hourly pay rate of the similarly situated white technician times the actual hours the plaintiff worked each year. The resulting figure, minus the plaintiff's actual annual salary, equals the amount of back pay damages awarded.
The period of the comparisons used to determine the extent of each plaintiff's injury began on the date two years prior to the filing of the particular plaintiff's EEOC complaint and ended when either he or she began receiving the same compensation as the person he or she is being compared with or when the particular plaintiff resigned or was terminated; whichever came first. In the case of plaintiffs Taylor and Palms, the period began on the date two years prior to the filing of their EEOC complains and continued to the present since both are still employed by Buckeye but have never reached the top wage rate comparable white technicians were paid.
Once the additional back pay amount was established, the court had the defendant determine the additional benefits each plaintiff would have been entitled to receive as a result of the increased salary each would have earned under the courts calculations.

JOHN TAYLOR
The court's findings of fact demonstrate that plaintiff John Taylor had numerous talents that Buckeye took advantage of which made him one of their most valued employees. The skills Taylor possessed and the manner in which he carried out his job earned similarly situated white employees at Buckeye the highest ratings and *1548 largest salaries paid by Buckeye. This employee, who Buckeye thought enough of to make a shift team coordinator, would have advanced rapidly at the company if not for its discriminatory Pay and Progression System. The court therefore finds that in order to place Taylor in the position he would have been in absent defendant's discriminatory practices, his compensation should be computed in accordance with what the highest paid technicians at Buckeye were paid.
One of the higher paid white technicians who Taylor compares most favorably to is Walter "Sonny" Ard. Consequently, the most reliable means of determining the damages Taylor is entitled to receive is to compare his wage rate to that of Walter Ard and award him such damages as would result in him earning the same compensation Buckeye paid Walter Ard when Ard was considered one of their top technicians. Such a comparison reveals that Taylor is entitled to a back pay damages award of $57,963.00[1] plus prejudgment interest and profit sharing benefits totaling 126.498 shares of Buckeye common stock, 3.572 shares of preferred stock, and $150.23 in cash. See Defendant's Supplemental Memorandum Regarding Damages, exh. C and exh. A-1. Those compensation computations which have been verified and are hereby adopted by the court, as is the case with all the compensation figures used in this order, were computed by the defendant in strict accordance with the court's instructions for compiling damages detailed earlier in this opinion. See appendix for a complete breakdown of all the compensation computations. In order to place Taylor in the position he would have been in absent defendant's discriminatory practices, Buckeye is also ORDERED to immediately begin paying Taylor at a wage rate comparable to a curve 5 pay rate and to maintain him on that wage rate as long as he satisfactorily performs his job.

TABITHA HERRING
A re-creation of plaintiff Tabitha Herring's employment history indicates that she would not have advanced as quickly or as far as plaintiff Taylor but, nevertheless, would have received greater compensation than she actually obtained if not for Buckeye's unlawful practices. The court noted in its findings of fact that Herring was unjustly injured when she had mechanical maintenance removed from her career plan and was continually denied the opportunity for meaningful advancement as a result of Buckeye's discriminatory Pay and Progression System. In attempting to discern how and when plaintiff Herring would have advanced absent the discrimination at Buckeye, the court finds that the careers of similarly situated white technicians Jerry Barry and Lynn West Barry provide a good example of how Herring's career would have progressed had she not been discriminated against. Those technicians, like Herring, were not considered, nor compensated as, top of the line employees. They were, however, competent employees who could be relied upon to perform their jobs in a satisfactory manner. A comparison of the compensation Jerry Barry received and that of plaintiff Herring indicates that in order to make her whole again she is entitled to a damage award of $17,510.00[2] in *1549 back pay plus prejudgment interest and profit sharing benefits totaling 47.146 shares of Buckeye common stock and $24.15 in cash. See Defendant's Supplemental Memorandum Regarding Damages, exh. A and exh. A-1.

JOHNNIE LEE PALMS
The skills and training plaintiff Johnnie Lee Palms brought to Buckeye made him a top candidate for rapid advancement within the company. It is clear from the court's findings that Buckeye recognized the accomplishments and talent of Palms by making him a shift team coordinator; one of its top positions for technicians. Palms performed tasks on the same skill level as Buckeye's higher rated white technicians. As a result of the discriminatory Pay and Progression System, however, Palms was not compensated or promoted similar to white technicians who were deemed superior technicians. Absent the discriminatory practices of Buckeye, Palms would have not only been utilized as one of Buckeye's top technicians; he also would have been compensated like one.
Above average white technicians at Buckeye who had similar skills and training as Palms, such as Joseph Willard Parker, provide the appropriate model for determining the extent of Palms damages. Comparing Palms compensation with that of Parker indicates that in order to place Palms in the position he would have been in had he not been discriminated against, Palms is entitled to receive a back pay award of $31,982.00[3] plus prejudgment interest and profit sharing benefits totaling 66.896 shares of Buckeye common stock, 1.388 shares of preferred stock, and $68.85 in cash. See Defendant's Supplemental Memorandum Regarding Damages, exh. D revised and exh. A-1. In order to place Palms in the position he would have been in absent defendant's discriminatory practices, Buckeye is also ORDERED to immediately begin paying Palms at a wage rate comparable to a curve 4 pay rate and to maintain him on that wage rate as long as he satisfactorily performs his job.

JAMES C. HOMER
Plaintiff James Homer was a hard working mechanical maintenance technician who eagerly sought to gain training skills in any area Buckeye would allow in order to enhance his value to the company. Because of Buckeye's discriminatory Pay and Progression System, however, Homer was consistently denied the opportunity to have cross skills added to his career plan and thereby increase his salary. He worked beside comparably skilled white technicians who were paid a higher salary than he was despite the fact that they all had the same job classification. Homer had the qualifications to have additional skills added to his career plan and to be compensated at rate equal to similarly situated white technicians such as William "Freddy" Hogg, Jr., and David "Tim" Phelps; and would have been so compensated absent Buckeye's discriminatory practices. Therefore, in order to make Homer whole again, he must be awarded compensation equal to that of Phelps' and Hogg's which amounts to damages of $13,759.00[4] in back pay plus prejudgment *1550 interest and profit sharing benefits totaling 37.149 shares of Buckeye common stock and $19.09 in cash. See Defendant's Supplemental Memorandum Regarding Damages, exh. B and exh. A-1.

GERRY PLANT
Plaintiff Gerry Plant exhibited a conscientious desire to excel in all phases of his job with Buckeye. Plant gained a reputation as being one of Buckeye's best technicians with unparalleled mechanical skills on some of the companies specialized equipment. Throughout his career at Buckeye he was a highly competent hard working technician who had the ability and qualifications to be a top technician. The evidence in the case indicates that absent Buckeye's discriminatory practices he would have been compensated as such.
Allen Massey, Ray Harth, and Roy Peterson are white technicians at Buckeye who had similar skills as Plant and demonstrate the promotions and compensation Plant would have received at Buckeye had he not been the victim of Buckeye's discriminatory practices. Comparing Ray Peterson's compensation to the compensation Plant earned indicates that Plant's damages as a result of Buckeye's discriminatory Pay and Progression System are $23,760.00[5] in back pay (which represents $33,760.00 computed as back pay owing minus the $10,000.00 damage award he received under his Section 1981 claim) plus prejudgment interest and profit sharing benefits totaling 85.100 shares of Buckeye common stock, 0.769 shares of preferred stock, and $63.37 in cash less a $1,000.00 deduction which must be made from Plant's profit sharing benefits since Plant received a previous jury award of $1,000.00 as compensation for lost benefits. See Defendant's Supplemental Memorandum Regarding Damages, exh. E and exh. A-1.

ISSIAH ROSS, JR.
Plaintiff Issiah Ross, Jr., was a solid employee who was able to carry on the day-to-day operation of the areas he was assigned to work in an acceptable manner. In performing his job, however, he was paid less than other similarly situated white technicians who were performing the same tasks with relatively the same results. An indication of Ross' qualifications and ability to perform his job as well as his higher paid counterparts is demonstrated by the fact that Buckeye chose him, and not his higher paid and rated fellow employees, to train technicians who were cross training in the area in which Ross worked. The court's findings demonstrate that Ross was initially placed on a lower pay scale than he deserved to be on and was kept there as a direct result of Buckeye's discriminatory Pay and Progression System. Had there been no discrimination at Buckeye, Ross undoubtedly would have received compensation commensurate with that received by Jerry Barry; a white technician at Buckeye of equal standing with Ross. A comparison between the compensation of Jerry Barry and Ross indicates that Ross suffered damages because of Buckeye's discriminatory practices in the amount of $21,971.00[6] in back pay plus prejudgment interest and profit sharing *1551 benefits totaling 54.410 shares of Buckeye common stock and $27.88 in cash. See Defendant's Supplemental Memorandum Regarding Damages, exh. F and exh. A-1.

II. ATTORNEY'S FEES
The final matter pending before the court in this case is the plaintiffs' motion for attorney's fees. The established procedure for resolving such an issue is for the court to determine the number of hours plaintiffs' attorney reasonably expended on the litigation and multiply that figure by a reasonable hourly rate. Hensley v. Eckerhart, 461 U.S. 424, 434, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). The resulting yield is commonly known as the "lodestar," which the court may then adjust up or down in its discretion depending on various considerations involved in the case.
The court's first step in determining the proper attorney's fees in this case will be to ascertain the appropriate reasonable hourly rate. "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." Norman v. Housing Authority of Montgomery, 836 F.2d 1292 (11th Cir.1988) (citing Blum v. Stenson, 465 U.S. 886, 895-96 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984)). The relevant legal community in this case is the area in which this court sits and the service provided was the litigation of a complex employment discrimination suit by an experienced attorney who demonstrated a considerable amount of skill in organizing and advocating plaintiffs' case. A review of the evidence the parties have submitted regarding a reasonable hourly rate in such an area for such services indicates that the prevailing rate a reasonably comparable attorney would receive is $135.00 per hour. Plaintiffs' attorney in the instant case, therefore, is entitled to compensation at the rate of $135.00 per hour.
The next step in deciding the appropriate attorney's fees award is to ascertain the number of hours reasonably expended by plaintiffs' attorney. In determining that figure, "`excessive, redundant or otherwise unnecessary' hours should be excluded from the amount claimed." Norman, 836 F.2d at 1301 (citing Hensley, 461 U.S. at 434, 103 S.Ct. at 1939-40). A careful review of the 2242.50 hours submitted by plaintiffs' attorney does not reveal the presence of any excessive, redundant or otherwise unnecessary hours which should be excluded from the amount he has claimed. Plaintiffs' attorney has used good "billing judgment" by submitting only hours which it would not be unreasonable to expect him to present to one of his paying clients.
Having determined the reasonable hourly rate ($135.00 per hour) and the hours reasonably expended (2242.50), the court is able to calculate that the lodestar amount in this case is $302,737.50 (2242.50 hours @ $135.00 per hour). Establishing the appropriate amount of attorney's fees to be awarded does not, however, end with the computation of the lodestar. The next step the court must undertake is to make any necessary adjustments to the lodestar based upon the results obtained by plaintiffs' attorney. Norman, 836 F.2d at 1302. The court's assessment of the results obtained in a case such as this, where the theories of the consolidated cases derive from a common core of operative facts, should focus on the overall outcome. Id. If that outcome, however significant, is "limited in comparison to the scope of the litigation as a whole," then it is proper for the court to reduce the lodestar figure. Id. "In doing so, the court may attempt to identify specific hours spent in unsuccessful claims or it may simply reduce the award by some proportion." Id.
Plaintiffs' attorney in the instant case realized significant results. The results were, however, limited when one notes that the litigation as a whole involved separate claims for relief by thirteen individual plaintiff of which six ultimately received a damages award. The court, therefore, finds it necessary to proportionately reduce the lodestar amount of $302,737.50 by twenty-five percent (25%) thereby arriving *1552 at an attorney's fees award of $227,053.12.
The court's reduction is not based on a simple ratio of successful plaintiffs to the total number of plaintiffs involved nor prevailing issues opposed to issues presented. See Hensley, 461 U.S. at 435 n. 11, 103 S.Ct. 1940 n. 11. Rather, the court took into account the fact that some of the plaintiffs' attorney's efforts were dedicated solely to advancing the cause of unsuccessful plaintiffs although a vast majority of his time was used to analyze, organize, and present evidence that was germane to all the cases. See id. at 435, 103 S.Ct. at 1940.
Another issue the court must address is whether the attorney's fees award should be enhanced. An enhancement is in order "if the results obtained were exceptional." Norman, 836 F.2d at 1302. A review of the outcome of this case based on that criteria indicates that an enhancement of the attorney's fees award is unwarranted. Plaintiffs' attorney obtained important results that will undoubtedly guide future actions and decisions of Buckeye. The outcome cannot be classified as exceptional, however, since it was not an unexpected result in light of the prevailing law which clearly outlaws the type of discrimination defendant imposed upon the plaintiffs. See Id.
Enhancement of an attorney's fees award may also be appropriate when the attorney's fee was set up on a contingency basis, as was the situation in this case. Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 483 U.S. 711, 730, 107 S.Ct. 3078, 3089, 97 L.Ed.2d 585 (1987) (Delaware Valley Citizens' Council II). That type of enhancement is to be awarded, however, only when it is demonstrated that it is necessary as the only means of insuring the availability of attorneys. Id. at 731, 107 S.Ct. at 3089 (O'Connor, J., concurring); Perkins v. Mobile Housing Board, 847 F.2d 735, 738-39 (11th Cir.1988). There has not been an adequate showing that attorneys were not, and are not, available in this court's district to take on the type of case now before the court. The court, therefore, declines to enhance the attorney's fees awarded in this case based on the existence of a contingency fee arrangement.
The final basis considered by the court upon which enhancement may be warranted is if there is a delay in the prevailing counsel's receipt of payment. Norman, 836 F.2d at 1302. If the court determines that there is a delay, it may "award compensation at current rates rather than at historic rates." Id. Plaintiffs' attorney began work on this case in 1985 and has yet to receive final compensation which leads this court to conclude that there has been a delay in his receipt of payment. The court, therefore, finds that the hourly rate applicable in this case should be computed in accordance with current rates and the court has done just that in arriving at the reasonable hourly rate of $135.00 afforded the plaintiffs' attorney.
As part of his attorneys' fees, plaintiffs' attorney has also requested reimbursement for mileage expenses totaling $2,009.41. Reasonable expenses are considered a component of reasonable attorney' fees in this circuit. Dowdell v. Apopka, 698 F.2d 1181 (11th Cir.1983). The court therefore GRANTS the request for mileage expenses totaling $2,009.41 since it considers the amount to be a reasonable expense; especially since this was an Albany Division case tried in the Macon Division.
Along with their request for attorney's fees, plaintiffs have also asked the court to award expert witness' fees and support staff costs. The expert witness' fees requested by the plaintiffs totals $85,992.50 for services rendered by Mr. Jimmy Ramsey. Recent case law indicates, however, that the court cannot award plaintiffs the expert witness' fees that they have requested.
In the case of International Woodworkers of America v. Champion International Corp., 790 F.2d 1174 (5th Cir.1986), the Fifth Circuit Court of Appeal thoroughly analyzed the issue of whether the prevailing party in a Title VII and 42 U.S.C. § 1981 employment discrimination suit was *1553 entitled to expert witness' fees. In resolving that issue, the court first noted that American courts have traditionally been denied the right to tax expert witness' fees beyond those specifically authorized by statute. It was only through creative interpretation of Senate reports read to indicate Congressional intent to apply different rules in civil rights cases that courts were able to award any expert witness' fees beyond those provided for in 28 U.S.C. § 1821.[7]See Jones v. Diamond, 636 F.2d 1364 (5th Cir.1981) (en banc), cert. dismissed, 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981), overruled by International Woodworkers of America, 790 F.2d at 1180. In overruling all previous decision it rendered based on such an interpretation, the court in International Woodworkers went on to note that a true reading of those reports fails to establish any judicial authority to award a prevailing party expert witness' fees. It concluded that:
Given Congress' ability to provide explicitly for the taxing of excess expert witness' fees as costs, we should not infer congressional intent to award such costs in the absence of an express statute so providing. Moreover, a statute which provides only for an award of "costs" or "attorneys' fees" but which fails to address expert witness' fees will not be construed to authorize the taxing of expert witness' fees in excess of the § 1821 amount.
International Woodworkers, 790 F.2d at 1179-80. Based on that conclusion and its finding that 42 U.S.C. § 1988 and § 2000e-5(k) make no provisions for an award of excess expert witness' fees, the court held that the prevailing plaintiff was not entitled to receive any expert witness' fees other than those specified in 28 U.S.C. § 1821. Id. at 1181.
The plaintiff in International Woodworkers appealed the decision of the Fifth Circuit and his petition for certiorari was granted by the Supreme Court of the United States. International Woodworkers of America, 790 F.2d 1174, cert. granted sub nom. Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). The Supreme Court reviewed the analysis employed by the Fifth Circuit in reaching it decision and stated "[w]e agree and hold that when a prevailing party seeks reimbursement for fees paid to its own expert witnesses, a federal court is bound by the limit of § 1821(b), absent contract or explicit statutory authority to the contrary." Crawford Fitting Co., 482 U.S. at 439, 107 S.Ct. at 2496. Accordingly, this court holds that plaintiffs in the instant case are not entitled to receive any expert witness' fees other than those specified in 28 U.S.C. § 1821. Those expenses plaintiffs' are entitled to receive as expert witness' fees under § 1821(b) will be taxed as costs which plaintiffs can recover by submitting a bill of costs to the clerk of court.
In line with the reasoning adopted in Crawford Fitting Co., the court is also precluded from reimbursing plaintiffs for the cost of services provided by Terri C. Long. There is no indication from the evidence that Ms. Long, a former manager at MacGregor Golf Co., performed any legal work which can be properly billed under the heading of reasonable attorney's fees. See Amendment To Motion For Attorney Fees And Costs For Plaintiffs Gerry Plant And Issiah Ross, exh. K. Ms. Long's expenses are more properly considered overhead which is covered under the hourly rate plaintiffs' attorney charges. Therefore, in accordance with the applicable law, plaintiffs' request for $1,875.00 as reimbursement for the services of Terri C. Long is DENIED.
Plaintiffs' request for payment for the services provided by two law students, Ray Brooks and Thomas Bond, and Cathy Hires, a paralegal, constitute a component of reasonable attorney's fees which a prevailing plaintiff is entitled to receive. Missouri v. Jenkins, 491 U.S. 274, 109 *1554 S.Ct. 2463, 105 L.Ed.2d 229 (1989); Riverside v. Rivera, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986). A review of the hours submitted by each of those legal support staff individuals reveals reasonable hourly rates in line with the prevailing market rate in this area for comparable services. Law student Ray Brooks logged 292.75 hours at a rate of $25.00 per hour. Affidavit of Raymond Thomas Brooks In Support Plaintiffs' Motion For Attorney's Fees. Law student Thomas Bond logged 35 hours at a rate of $25.00 per hour. Amendment To Motion For Attorney Fees And Costs For Plaintiffs Gerry Plant And Issiah Ross, exh. M. Paralegal Cathy Hires logged 75 hours at a rate of $50.00 per hour. Id., exh. L. The hours presented also all represent hours reasonably expended without the inclusion of any excessive, redundant or otherwise unnecessary hours in the amount claimed. The lodestar computations for the legal support staff, therefore, yields the amounts of: $7,318.75 (292.75 hours @ $25.00 per hour) for the services of law student Ray Brooks; $875.00 (35 hours @ $25.00 per hour) for the services of law student Thomas Bond; and $3,750.00 (75 hours @ $50.00 per hour) for the services of paralegal Cathy Hires.
The legal support staff's hours are also subject to the same twenty-five percent (25%) lodestar reduction applied to plaintiffs' attorney's hours since the legal staff similarly worked on the successful, as well as the unsuccessful, claims. Accordingly, plaintiffs are entitled to receive the following amount as compensation for legal support staff fees: $5,489.06 for the services of law student Ray Brooks; $656.25 for the services of law student Thomas Bond; and $2,812.50 for the services of paralegal Cathy Hires.

III. CONCLUSION
Based on the findings of fact and conclusions of law made in Buckeye I and Buckeye II, the court hereby ORDERS that in accordance with the above stated rulings defendant pay damages to the prevailing plaintiffs totaling: $57,963.00 plus prejudgment interest and profit sharing benefits totaling 126.498 shares of Buckeye common stock, 3.572 shares of preferred stock, and $150.23 in cash to plaintiff Taylor; $17,510.00 in back pay plus prejudgment interest and profit sharing benefits totaling 47.146 shares of Buckeye common stock and $24.15 in cash to plaintiff Herring; $31,982.00 in back pay plus prejudgment interest and profit sharing benefits totaling 66.896 shares of Buckeye common stock, 1.388 shares of preferred stock, and $68.85 in cash to plaintiff Palms; $13,759.00 in back pay plus prejudgment interest and profit sharing benefits totaling 37.149 shares of Buckeye common stock and $19.09 in cash to plaintiff Homer; $23,760.00 in back pay plus prejudgment interest and profit sharing benefits totaling 85.100 shares of Buckeye common stock, 0.769 shares of preferred stock, and $63.37 in cash to plaintiff Plant (less a $1,000.00 deduction from Plant's profit sharing benefits); and $21,971.00 in back pay plus prejudgment interest and profit sharing benefits totaling 54.410 shares of Buckeye common stock and $27.88 in cash to plaintiff Ross.
Defendant Buckeye is also ORDERED to pay a total of $175,794.10 in attorney's fees.[8]
Lastly, the court RULES that all outstanding motions not addressed herein are made moot by this order and hereby DISMISSED WITHOUT PREJUDICE.
SO ORDERED.

*1555 APPENDIX

TABITHA HERRING'S HISTORY OF WAGE RATES (actual)
ACTUAL
PERSONAL
ADJSTMNTS EFFECTIVE DATES OF GENERAL ADJUSTMENTS TO WAGE RATES 
EFFECTIVE
DATE PAY LEVEL 1980 10/6/80 6/15/81 6/7/82 6/13/83 6/25/84 9/29/86 8/1/88 7/31/89 7/2/90
 6/9/80 Hire Rate 6.50
 9/15/80 T-103 7.00 7.20
 12/8/80 T-106 7.85
 T-109
 T-112
 T-118
 T-124
 3/9/81 T-209 8.50
 T-212
 T-218
 T-224
 6/13/83 T-230 * 11.55 12.20 12.50 12.81
 6/8/81 T-312 9.05 9.85 * Ms. Herring went from her pay point on Curve 3 to
 12/7/81 T-318 10.60 11.30 a pay point on Curve 2 that was higher in cents/ho
 T-324
 T-330
 6/5/89 T-336 14.19 14.59 15.17
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
Actual Wage Rates (Tabitha Herring)
 1983 1984 1985 1986 1987 1988 1989 1990 1991
January 11.30 11.55 12.20 12.20 12.50 12.50 12.81 14.59 15.17
February 11.30 11.55 12.20 12.20 12.50 12.50 12.81 14.59 15.17
March 11.30 11.55 12.20 12.20 12.50 12.50 12.81 14.59 15.17
April 11.30 11.55 12.20 12.20 12.50 12.50 12.81 14.59 15.17
May 11.30 11.55 12.20 12.20 12.50 12.50 12.81 14.59
June 11.55 11.55 12.20 12.20 12.50 12.50 14.19 14.59
July 11.55 12.20 12.20 12.20 12.50 12.50 14.19 15.17
August 11.55 12.20 12.20 12.20 12.50 12.81 14.59 15.17
September 11.55 12.20 12.20 12.20 12.50 12.81 14.59 15.17
October 11.55 12.20 12.20 12.50 12.50 12.81 14.59 15.17
November 11.55 12.20 12.20 12.50 12.50 12.81 14.59 15.17
December 11.55 12.20 12.20 12.50 12.50 12.81 14.59 15.17
Average 11.45 11.88 12.20 12.20 12.50 12.63 13.78 14.88 15.17
W-2 Earnings $29,260 $29,540 $31,436 $32,242 $26,899 $8,267 $30,165 $39,821 $12,931
Equiv. Pd. Hrs. 2555 2487 2577 2626 2152 655 2189 2676 852
FDH (herring3) 5/8/91

*1556
TABITHA HERRING'S "WHAT IF?" WAGE RATES (had she received same wage rates as Jerry Barry)
PERSONAL Jerry Barry's history of wage rates:
ADJSTMNTS EFFECTIVE DATES OF GENERAL ADJUSTMENTS TO WAGE RATES 
EFFECTIVE
DATE PAY LEVEL 1980 10/6/80 6/15/81 6/7/82 6/13/83 6/25/84 9/29/86 8/1/88 7/31/89 7/2/90
 6/9/80 Hire Rate 6.50
 9/15/80 T-103 7.00 7.20
 12/8/80 T-106 7.85
 T-109
 T-112
 T-118
 T-124
 3/9/81 T-209 8.50
 T-212
 T-218
 T-224
 T-230
 6/8/81 T-312 9.05 9.85
 12/7/81 T-318 10.60
 6/7/82 T-324 10.95 11.65
 12/6/82 T-330 12.00
 6/6/83 T-336 12.15 12.80 13.55 13.85 14.19 14.59 15.17
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
TABITHA HERRING'S "WHAT IF?" WAGE RATES (had she received same wage rates as Jerry Barry)
Jerry Barry's history of
 wage rates (Curve 3) 1983 1984 1985 1986 1987 1988 1989 1990 1991
January 12.00 12.80 13.55 13.55 13.85 13.85 14.19 14.59 15.17
February 12.00 12.80 13.55 13.55 13.85 13.85 14.19 14.59 15.17
March 12.00 12.80 13.55 13.55 13.85 13.85 14.19 14.59 15.17
April 12.00 12.80 13.55 13.55 13.85 13.85 14.19 14.59 15.17
May 12.00 12.80 13.55 13.55 13.85 13.85 14.19 14.59
June 12.80 12.80 13.55 13.55 13.85 13.85 14.19 14.59
July 12.80 13.55 13.55 13.55 13.85 13.85 14.19 15.17
August 12.80 13.55 13.55 13.55 13.85 14.19 14.59 15.17
September 12.80 13.55 13.55 13.55 13.85 14.19 14.59 15.17
October 12.80 13.55 13.55 13.85 13.85 14.19 14.59 15.17
November 12.80 13.55 13.55 13.85 13.85 14.19 14.59 15.17
December 12.80 13.55 13.55 13.85 13.85 14.19 14.59 15.17
Barry's Average Rate 12.47 13.18 13.55 13.63 13.85 13.99 14.36 14.88 15.17
Herrings's Equiv. Pd. 2555 2487 2577 2626 2152 655 2189 2676 852
Herring's "What If?" $31,861 $32,779 $34,918 $35,792 $29,805 $9,163 $31,434 $39,821 $12,931
Herring's Actual $29,260 $29,540 $31,436 $32,242 $26,899 $8,267 $30,165 $39,821 $12,931
Difference $2,601 $3,239 $3,482 $3,550 $2,906 $896 $1,269 $0 $0
FDH (herring3) 5/8/91

*1557
JAMES HOMER'S HISTORY OF WAGE RATES (actual)
ACTUAL
PERSONAL
ADJSTMNTS EFFECTIVE DATES OF GENERAL ADJUSTMENTS TO WAGE RATES 
EFFECTIVE
DATE PAY LEVEL 1980 10/6/80 6/15/81 6/7/82 6/13/83 6/25/84 9/29/86 8/1/88 7/31/89 7/2/90
 7/7/80 Hire Rate 6.50 6.50
 10/13/80 T-103 7.20
 1/5/81 T-106 7.85
 T-109
 T-112
 T-118
 T-124
 4/6/81 T-209 8.50 9.25
 T-212
 T-218
 T-224
 T-230
 7/6/81 T-312 9.85
 1/4/82 T-318 10.60 11.30
 7/5/82 T-324 11.65
 1/3/83 T-330 12.00 12.60
 7/5/83 T-336 12.80 13.55 13.85
 T-424
 T-430
 T-436
 * 4/4/88 T-442 * Actual qualification and promotion date. 14.90 15.27 15.70 16.33
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
Actual Wage Rates (James Homer)
 1983 1984 1985 1986 1987 1988 1989 1990 1991
January 12.00 12.80 13.55 13.55 13.85 13.85 15.27 15.70 16.33
February 12.00 12.80 13.55 13.55 13.85 13.85 15.27 15.70 16.33
March 12.00 12.80 13.55 13.55 13.85 13.85 15.27 15.70 16.33
April 12.00 12.80 13.55 13.55 13.85 14.90 15.27 15.70 16.33
May 12.00 12.80 13.55 13.55 13.85 14.90 15.27 15.70
June 12.60 12.80 13.55 13.55 13.85 14.90 15.27 15.70
July 12.80 13.55 13.55 13.55 13.85 14.90 15.27 16.33
August 12.80 13.55 13.55 13.55 13.85 15.27 15.70 16.33
September 12.80 13.55 13.55 13.55 13.85 15.27 15.70 16.33
October 12.80 13.55 13.55 13.85 13.85 15.27 15.70 16.33
November 12.80 13.55 13.55 13.85 13.85 15.27 15.70 16.33
December 12.80 13.55 13.55 13.85 13.85 15.27 15.70 16.33
Average 12.45 13.18 13.55 13.63 13.85 14.79 15.45 16.02 16.33
Actual W-2 Earnings $32,138 $35,594 $36,597 $37,679 $39,186 $35,677 $36,823 $40,609 $14,404
Equiv. Pd. Hrs. 2581 2701 2701 2764 2829 2412 2383 2535 882
FDH (homer3) 5/8/91

*1558
JAMES HOMER'S "WHAT IF?" WAGE RATES (had he received same wage rates as William Hogg and David Phelps)
PERSONAL Hogg's and Phelp's history of wage rates:
ADJSTMNTS EFFECTIVE DATES OF GENERAL ADJUSTMENTS TO WAGE RATES 
EFFECTIVE
DATE PAY LEVEL 1980 10/6/80 6/15/81 6/7/82 6/13/83 6/25/84 9/29/86 8/1/88 7/31/89 7/2/90
 6/9/80 Hire Rate 6.50
 9/15/80 T-103 7.00 7.20
 12/8/80 T-106 7.85
 T-109
 T-112
 T-118
 T-124
 3/9/81 T-209 8.50
 T-212
 T-218
 T-224
 T-230
 6/8/81 T-312 9.05 9.85
 12/7/81 T-318 10.60
 T-324
 T-330
 T-336
 6/7/82 T-424 11.40 12.15
 12/6/82 T-430 12.75 13.40
 9/5/83 T-436 13.70
 3/5/84 T-442 13.85 14.60 14.90 15.27 15.70 16.33
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
JAMES HOMER'S "WHAT IF?" WAGE RATES (had he received same wage rates as William Hogg and David Phelps)
Hogg's and Phelps' history
of wage rates (Curve 4) 1983 1984 1985 1986 1987 1988 1989 1990 1991
January 12.75 13.70 14.60 14.60 14.90 14.90 15.27 15.70 16.33
February 12.75 13.70 14.60 14.60 14.90 14.90 15.27 15.70 16.33
March 12.75 13.85 14.60 14.60 14.90 14.90 15.27 15.70 16.33
April 12.75 13.85 14.60 14.60 14.90 14.90 15.27 15.70 16.33
May 12.75 13.85 14.60 14.60 14.90 14.90 15.27 15.70
June 13.40 13.85 14.60 14.60 14.90 14.90 15.27 15.70
July 13.40 14.60 14.60 14.60 14.90 14.90 15.27 16.33
August 13.40 14.60 14.60 14.60 14.90 15.27 15.70 16.33
September 13.70 14.60 14.60 14.60 14.90 15.27 15.70 16.33
October 13.70 14.60 14.60 14.90 14.90 15.27 15.70 16.33
November 13.70 14.60 14.60 14.90 14.90 15.27 15.70 16.33
December 13.70 14.60 14.60 14.90 14.90 15.27 15.70 16.33
Average 13.23 14.20 14.60 14.68 14.90 15.05 15.45 16.02 16.33
Equiv. Pd. Hrs. 2581 2701 2701 2764 2829 2412 2383 2535 882
"What If?" Earnings $34,147 $38,354 $39,435 $40,576 $42,152 $36,301 $36,823 $40,609 $14,404
Actual W-2 Earnings $32,138 $35,594 $36,597 $37,679 $39,186 $35,677 $36,823 $40,609 $14,404
Difference $2,009 $2,760 $2,838 $2,897 $2,966 $624 $0 $0 $0
FDH (homer3) 5/8/91

*1559
JOHN TAYLOR'S HISTORY OF WAGE RATES (actual)
ACTUAL
PERSONAL
ADJSTMNTS EFFECTIVE DATES OF GENERAL ADJUSTMENTS TO WAGE RATES 
EFFECTIVE
 DATE PRY LEVEL 1980 10/6/80 6/15/81 6/7/82 6/13/83 6/25/84 9/29/86 8/1/88 7/31/89 7/2/90
 9/8/80 Hire Rate 6.50 6.50
 12/8/80 T-103 7.20
 3/2/81 T-106 7.85
 T-109
 T-112
 T-118
 T-124
 6/8/81 T-209 8.50 9.25
 9/7/81 T-212 9.50
 3/8/82 T-218 9.85 10.50
 9/6/82 T-224 10.80
 3/7/83 T-230 11.00 11.55 12.20 12.50
 T-312
 T-318
 T-324
 T-330
 9/28/87 T-336 13.85 14.19 14.59
 T-424
 T-430
 T-436
 5/7/90 T-442 15.70 16.33
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
Actual Wage Rates (John Taylor)
 1983 1984 1985 1986 1987 1988 1989 1990 1991
January 10.80 11.55 12.20 12.20 12.50 13.85 14.19 14.59 16.33
February 10.80 11.55 12.20 12.20 12.50 13.85 14.19 14.59 16.33
March 11.00 11.55 12.20 12.20 12.50 13.85 14.19 14.59 16.33
April 11.00 11.55 12.20 12.20 12.50 13.85 14.19 14.59 16.33
May 11.00 11.55 12.20 12.20 12.50 13.85 14.19 15.70
June 11.55 11.55 12.20 12.20 12.50 13.85 14.19 15.70
July 11.55 12.20 12.20 12.20 12.50 13.85 14.19 16.33
August 11.55 12.20 12.20 12.20 12.50 14.19 14.59 16.33
September 11.55 12.20 12.20 12.20 12.50 14.19 14.59 16.33
October 11.55 12.20 12.20 12.50 13.85 14.19 14.59 16.33
November 11.55 12.20 12.20 12.50 13.85 14.19 14.59 16.33
December 11.55 12.20 12.20 12.50 13.85 14.19 14.59 16.33
Average 11.29 11.88 12.20 12.28 12.84 13.99 14.36 15.65 16.33
W-2 Earnings $33,777 $30,084 $32,356 $33,777 $35,587 $36,282 $38,167 $40,740 $15,471
Equiv. Pd. Hrs. 2992 2532 2652 2751 2772 2593 2658 2603 947
FDH (taylor3) 5/8/91

*1560
JOHN TAYLOR'S "WHAT IF?" WAGE RATES (had he received same wage rates as Sonny Ard---and stayed on Curve 5)
PERSONAL Sonny Ard's history of wage rates:
ADJSTMNTS EFFECTIVE DATES OF GENERAL ADJUSTMENTS TO WAGE RATES 
EFFECTIVE
 DATE PRY LEVEL 1980 10/6/80 6/15/81 6/7/82 6/13/83 6/25/84 9/29/86 8/1/88 7/31/89 7/2/90
 9/8/80 Hire Rate 6.50 6.50
 12/8/80 T-103 7.20
 3/2/81 T-106 7.85
 T-109
 T-112
 T-118
 T-124
 6/15/81 T-209 8.50 9.25
 T-212
 T-218
 T-224
 T-230
 9/7/81 T-312 9.85
 3/8/82 T-318 10.60 11.30
 T-324
 T-330
 T-336
 9/6/82 T-424 12.15
 3/7/83 T-430 12.75 13.40
 9/5/83 T-536 14.00
 3/5/84 T-542 14.55 15.30
 9/3/84 T-548 15.75 16.05 16.45 16.91 17.59
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
JOHN TAYLOR'S "WHAT IF?" WAGE RATES (had he received same wage rates as Sonny Ard---and stayed on Curve 5)
Sonny Ard's history of
wage rates (Curve 5) 1983 1984 1985 1986 1987 1988 1989 1990 1991
January 12.15 14.00 15.75 15.75 16.05 16.05 16.45 16.91 17.59
February 12.15 14.00 15.75 15.75 16.05 16.05 16.45 16.91 17.59
March 12.75 14.55 15.75 15.75 16.05 16.05 16.45 16.91 17.59
April 12.75 14.55 15.75 15.75 16.05 16.05 16.45 16.91 17.59
May 12.75 14.55 15.75 15.75 16.05 16.05 16.45 16.91
June 13.40 14.55 15.75 15.75 16.05 16.05 16.45 16.91
July 13.40 15.30 15.75 15.75 16.05 16.05 16.45 17.59
August 13.40 15.30 15.75 15.75 16.05 16.45 16.91 17.59
September 14.00 15.75 15.75 15.75 16.05 16.45 16.91 17.59
October 14.00 15.75 15.75 16.05 16.05 16.45 16.91 17.59
November 14.00 15.75 15.75 16.05 16.05 16.45 16.91 17.59
December 14.00 15.75 15.75 16.05 16.05 16.45 16.91 17.59
Ard's Average Rate 13.23 14.98 15.75 15.83 16.05 16.22 16.64 17.25 17.59
Taylor's Equiv. Pd. Hr 2992 2532 2652 2751 2772 2593 2658 2603 947
Taylor's "What If?" $39,584 $37,929 $41,769 $43,548 $44,491 $42,058 $44,229 $44,902 $16,658
Taylor's Actual $33,777 $30,084 $32,356 $33,777 $35,587 $36,282 $38,167 $40,740 $15,471
Difference $5,807 $7,845 $9,413 $9,771 $8,904 $5,776 $6,062 $4,162 $1,187
FDH (taylor3) 5/8/91

*1561
JOHNNIE PALMS' HISTORY OF WAGE RATES (actual)
___________________________________
ACTUAL
PERSONAL
ADJSTMNTS EFFECTIVE DATES OF GENERAL ADJUSTMENTS TO WAGE RATES
EFFECTIVE ___________________________________________________________
DATE PAY LEVEL 1980 10/6/80 6/15/81 6/7/82 6/13/83 6/25/84 9/29/86 8/1/88 7/31/89 7/2/90
_________ _________ ______ _______ _______ ______ _______ _______ _______ ______ _______ ______
 9/8/80 Hire Rate 6.50 6.50
 12/8/80 T-103 7.20
 3/2/81 T-106 7.85
 T-109
 T-112
 T-118
 T-124
 6/8/81 T-209 8.50 9.25
 T-212
 T-218
 T-224
 T-230
 9/7/81 T-312 9.85
 3/8/82 T-318 10.60 11.30
 9/6/82 T-324 11.65
 3/7/83 T-330 12.00 12.60
 9/3/93 T-336 12.80 * 13.10 13.41
 1/10/89 Tech 3 14.19 14.59 15.17
 * Mr. Palms had been "on hold"; his next pay increase
 would have been when the top pay point on Curve 2
 exceded $12.80. However, since the plant was about
 to adopt a new progression system, we chose to give
 the same $.30/hr. increase as others received.
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
Actual Wage Rates (Johnnie Palms)
 1983 1984 1985 1986 1987 1988 1989 1990 1991
 ____ ____ ____ ____ ____ ____ ____ ____ ____
January 11.65 12.80 12.80 12.80 13.10 13.10 13.41 14.59 15.17
February 11.65 12.80 12.80 12.80 13.10 13.10 13.41 14.59 15.17
March 12.00 12.80 12.80 12.80 13.10 13.10 13.41 14.59 15.17
April 12.00 12.80 12.80 12.80 13.10 13.10 14.19 14.59 15.17
May 12.00 12.80 12.80 12.80 13.10 13.10 14.19 14.59
June 12.60 12.80 12.80 12.80 13.10 13.10 14.19 14.59
July 12.60 12.80 12.80 12.80 13.10 13.10 14.19 15.17
August 12.60 12.80 12.80 12.80 13.10 13.41 14.59 15.17
September 12.80 12.80 12.80 12.80 13.10 13.41 14.59 15.17
October 12.80 12.80 12.80 13.10 13.10 13.41 14.59 15.17
November 12.80 12.80 12.80 13.10 13.10 13.41 14.59 15.17
December 12.80 12.80 12.80 13.10 13.10 13.41 14.59 15.17
Average 12.36 12.80 12.80 12.88 13.10 13.23 14.16 14.88 15.17
Actual W-2 Earnings $31,385 $33,107 $34,031 $34,241 $37,856 $31,187 $34,065 $34,265 $14,432
Equiv. Pd. Hrs. 2540 2586 2659 2659 2890 2357 2405 2303 951
FDH (palms3) 5/28/91

*1562
JOHNNIE PALMS' "WHAT IF?" WAGE RATES (had he received same wage rates as Joseph Willard Parker)
____________________________________
PERSONAL Joseph Willard Parker's history of wage rates:
ADJSTMNTS EFFECTIVE DATES OF GENERAL ADJUSTMENTS TO WAGE RATES
EFFECTIVE ___________________________________________________________________
DATE PAY LEVEL 1980 10/6/80 6/15/81 6/7/82 6/13/83 6/25/84 9/29/86 8/1/88 7/31/89 7/2/90
________ _________ ______ _______ _______ ______ _______ _______ _______ ______ _______ ______
 1/14/80 Hire Rate 6.63
 3/24/80 T-103 7.25
 4/14/80 T-106 8.00 8.05
 T-109
 T-112
 T-118
 T-124
 T-209
 T-212
 10/20/80 T-218 9.10 9.85
 T-224
 T-230
 T-312
 7/13/81 T-318 10.60
 T-324
 T-330
 T-336
 1/11/82 T-424 11.40 12.16
 7/12/82 T-430 12.75
 1/10/83 T-436 13.05 13.70
 7/11/83 T-442 13.85 14.60 14.90 15.25 15.70 16.33
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
JOHNNIE PALMS' "WHAT IF?" WAGE RATES (had he received same wage rates as Joseph Willard Parker)
J. Willard Parker's history
of wage rates (Curve 4) 1983 1984 1985 1986 1987 1988 1989 1990 1991
----------------------- ____ ____ ____ ____ ____ ____ ____ ____ ____
January 13.05 13.85 14.60 14.60 14.90 14.90 15.25 15.70 16.33
February 13.05 13.85 14.60 14.60 14.90 14.90 15.25 15.70 16.33
March 13.05 13.85 14.60 14.60 14.90 14.90 15.25 15.70 16.33
April 13.05 13.85 14.60 14.60 14.90 14.90 15.25 15.70 16.33
May 13.05 13.85 14.60 14.60 14.90 14.90 15.25 15.70
June 13.70 13.85 14.60 14.60 14.90 14.90 15.25 15.70
July 13.85 14.60 14.60 14.60 14.90 14.90 15.25 16.33
August 13.85 14.60 14.60 14.60 14.90 15.25 15.70 16.33
September 13.85 14.60 14.60 14.60 14.90 15.25 15.70 16.33
October 13.85 14.60 14.60 14.90 14.90 15.25 15.70 16.33
November 13.85 14.60 14.60 14.90 14.90 15.25 15.70 16.33
December 13.85 14.60 14.60 14.90 14.90 15.25 15.70 16.33
Parker's Average Rate 13.50 14.23 14.60 14.68 14.90 15.05 15.44 16.02 16.33
Palms' Equiv. Pd. Hrs. 2540 2586 2659 2659 2890 2357 2405 2303 951
Palms' "What if?" $34,290 $36,799 $38,821 $39,034 $43,061 $35,473 $37,133 $36,894 $15,530
Palms' Actual $31,385 $33,107 $34,031 $34,241 $37,356 $31,187 $34,065 $34,265 $14,432
Difference $2,905 $3,692 $4,790 $4,793 $5,205 $4,286 $3,068 $2,629 $1,098
FDH (palms3) 5/28/91

*1563
GERRY PLANT'S HISTORY OF WAGE RATES (actual)
___________________________________
ACTUAL
PERSONAL
ADJSTMNTS EFFECTIVE DATES OF GENERAL ADJUSTMENTS TO WAGE RATES
EFFECTIVE ________________________________________________________________
DATE. PAY LEVEL 1980 10/6/80 6/15/81 6/7/82 6/13/83 6/25/84 9/29/86 8/1/88 7/31/89
_________ _________ ______ _______ _______ ______ _______ _______ _______ ______ _______
 6/9/80 Hire Rate 6.50
 9/15/90 T-103 7.00 7.20
 12/8/80 T-106 7.85
 T-109
 T-112
 T-118
 T-124
 3/9/81 T-209 8.50
 T-212
 T-218
 T-224
 T-230
 6/8/81 T-312 9.05 9.85
 12/7/81 T-318 10.60
 6/7/82 T-324 10.95 11.65
 12/6/82 T-330 12.00
 6/6/83 T-336 12.15 12.80 13.55 13.85
 T-424
 T-430
 T-436
 11/9/87 T-442 14.90 15.27 15.70 terminated 11/21/89
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
Actual Wage Rates (Gerry Plant)
 1983 1984 1985 1986 1987 1988 1989
 _____ _____ _____ _____ _____ _____ _____
January 12.00 12.80 13.55 13.55 13.85 14.90 15.27
February 12.00 12.80 13.55 13.55 13.85 14.90 15.27
March 12.00 12.80 13.55 13.55 13.85 14.90 15.27
April 12.00 12.80 13.55 13.55 13.85 14.90 15.27
May 12.00 12.80 13.55 13.55 13.85 14.90 15.27
June 12.80 12.80 13.55 13.55 13.85 14.90 15.27
July 12.80 13.55 13.55 13.55 13.85 14.90 15.27
August 12.80 13.55 13.55 13.55 13.85 15.27 15.70
September 12.80 13.55 13.55 13.55 13.85 15.27 15.70
October 12.80 13.55 13.55 13.85 13.85 15.27 15.70
November 12.80 13.55 13.55 13.85 14.90 15.27 15.70
December 12.80 13.55 13.55 13.85 14.90 15.27
Average 12.47 13.18 13.55 13.63 14.03 15.05 15.43
Actual W-2 Earnings $33,826 $36,057 $40,077 $39,853 $43,640 $38,699 $28,618
Equiv. Pd. Hrs. 2713 2736 2958 2924 3110 2571 1855
FDH (plant3) 5/8/91

*1564
GERRY PLANT'S "WHAT IF?" WAGE RATES (had he received same wage rates as Roy Peterson)
___________________________________
PERSONAL Roy Peterson's history of wage rates:
ADJSTMNTS EFFECTIVE DATES OF GENERAL ADJUSTMENTS TO WAGE RATES
EFFECTIVE ________________________________________________________________
DATE PAY LEVEL 1980 10/6/80 6/15/81 6/7/82 6/13/83 6/25/84 9/29/86 8/1/88 7/31/89
_________ _________ ______ _______ _______ ______ _______ _______ _______ ______ _______
 12/3/79 Hire Rate 6.63
 3/3/80 T-103 7.25
 3/24/80 T-106 8.00
 9/8/80 T-109 9.00
 T-112
 T-209
 T-212
 T-218 9.10
 T-224
 T-230
 T-312
 6/1/81 T-318 9.75 10.60
 T-324
 T-330
 T-336
 11/30/81 T-424 11.40
 5/31/82 T-430 12.00 12.75
 11/29/82 T-436 13.35
 T-442
 5/30/83 T-542 13.90 14.55
 11/28/83 T-548 15.00 15.75 16.05 16.45 16.91
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
GERRY PLANT'S "WHAT IF?" WAGE RATES (had he received same wage rates as Roy Peterson)
Roy Peterson's history
of wage rates (Curve 5) 1983 1984 1985 1986 1987 1988 1989
---------------------- ____ ____ ____ ____ ____ ____ ____
January 13.35 15.00 15.75 15.75 16.05 16.05 16.45
February 13.35 15.00 15.75 15.75 16.05 16.05 16.45
March 13.35 15.00 15.75 15.75 16.05 16.05 16.45
April 13.35 15.00 15.75 15.75 16.05 16.05 16.45
May 13.35 15.00 15.75 15.75 16.05 16.05 16.45
June 14.55 15.00 15.75 15.75 16.05 16.05 16.45
July 14.55 15.75 15.75 15.75 16.05 16.05 16.45
August 14.55 15.75 15.75 15.75 16.05 16.45 16.91
September 14.55 15.75 15.75 15.75 16.05 16.45 16.91
October 14.55 15.75 15.75 16.05 16.05 16.45 16.91
November 14.55 15.75 15.75 16.05 16.05 16.45 16.91
December 15.00 15.75 15.75 16.05 16.05 16.45
Average 14.09 15.38 15.75 15.83 16.05 16.22 16.62
Equiv. Pd. Hrs. 2713 2736 2958 2924 3110 2571 1855
"What If?" Earnings $38,226 $42,080 $46,589 $46,287 $49,916 $41,702 $30,830
Actual W-2 Earnings $33,826 $36,057 $40,077 $39,853 $43,640 $38,699 $28,618
Difference $4,400 $6,023 $6,512 $6,434 $6,276 $3,003 $2,212
FDH (plant3) 5/8/91

*1565
IKE ROSS' WAGE RATES (had he remained employed on Curve 2 until resignation)
_______________________________
PERSONAL
ADJSTMNTS EFFECTIVE DATES OF GENERAL ADJUSTMENTS TO WAGE RATES
EFFECTIVE _______________________________________________________________
DATE PAY LEVEL 1980 10/6/80 6/15/81 6/7/82 6/13/83 6/25/84 9/29/86 8/1/88
_________ _________ ______ _______ _______ ______ _______ _______ _______ ______
 6/9/80 Hire Rate 6.50
 10/6/80 T-103 7.00 7.20
 12/8/80 T-106 7.85
 3/9/81 T-109 8.05
 T-112
 T-118
 T-124
 6/8/81 T-209 8.50 9.25
 9/7/81 T-212 9.50
 3/8/82 T-218 9.85 10.50
 9/6/82 T-224 10.80
 3/7/83 T-230 11.00 11.55 12.20 12.50 12.81 resigned 7/31/89
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
IKE ROSS' WAGE RATES (had he remained employed on Curve 2 until resignation)
 1983 1984 1985 1986 1987 1988 1989
 ____ ____ ____ ____ ____ ____ ____
January 10.80 11.55 12.20 12.20 12.50 12.50 12.81
February 10.80 11.55 12.20 12.20 12.50 12.50 12.81
March 11.00 11.55 12.20 12.20 12.50 12.50 12.81
April 11.00 11.55 12.20 12.20 12.50 12.50 12.81
May 11.00 11.55 12.20 12.20 12.50 12.50 12.81
June 11.55 12.20 12.20 12.20 12.50 12.50 12.81 rehired 6/15/89
July 11.55 12.20 12.20 12.20 12.50 12.50 12.81 resigned 7/31/89
August 11.55 12.20 12.20 12.20 12.50 12.81
September 11.55 12.20 12.20 12.20 12.50 12.81
October 11.55 12.20 12.20 12.50 12.50 12.81
November 11.55 12.20 12.20 12.50 12.50 12.81
December 11.55 12.20 12.20 12.50 12.50 12.81
Average 11.29 11.93 12.20 12.28 12.50 12.63 12.81
Actual W-2 Earnings $29,461 $29,834
Equiv. Pd. Hrs. 2609 2501
= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =
(NOTE: This information taken from second page  to calculate "Barry Equiv. Pd. Hrs.")
Barry W-2 Earnings $36,495 $36,525 $37,632 $36,550 $21,199 (--- ($36,341)(7/12)
Barry Ave. Wage Rate 13.55 13.63 13.85 13.99 14.19
Barry Equiv. Pd. Hrs. 2693 2680 2717 2613 1494
= = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =
Earnings (if employed) $32,859 $32,907 $33,964 $32,997 $19,137
FDH (ross3) 5/8/91

*1566
IKE ROSS' "WHAT IF?" WAGE RATES (had he received same wage rates as Jerry Barry)
_______________________________________
PERSONAL Jerry Barry's history of wage rates:
ADJSTMNTS EFFECTIVE DATES OF GENERAL ADJUSTMENTS TO WAGE RATES
EFFECTIVE ___________________________________________________________
DATE PAY LEVEL 1980 10/6/80 6/15/81 6/7/82 6/13/83 6/25/84 9/29/86 8/1/88 7/31/89 7/2/90
_________ _________ ____ _______ _______ ______ _______ _______ _______ ______ _______ ______
 6/9/80 Hire Rate 6.50
 9/15/80 T-103 7.00 7.20
 12/8/80 T-106 7.85
 T-109
 T-112
 T-118
 T-124
 3/9/81 T-209 8.50
 T-212
 T-218
 T-224
 T-230
 6/8/81 T-312 9.05 9.85
 12/7/81 T-318 10.60
 6/7/82 T-324 10.95 11.65
 12/6/82 T-330 12.00
 6/6/83 T-336 12.15 12.80 13.55 13.85 14.19 14.59 15.17
* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
IKE ROSS' "WHAT IF?" WAGE RATES (had he received same wage rates as Jerry Barry)
Jerry Barry's history of
wage rates (Curve 3) 1983 1984 1985 1986 1987 1988 1989
-------------------- ____ ____ ____ ____ ____ ____ ____
January 12.00 12.80 13.55 13.55 13.85 13.85 14.19
February 12.00 12.80 13.55 13.55 13.85 13.85 14.19
March 12.00 12.80 13.55 13.55 13.85 13.85 14.19
April 12.00 12.80 13.55 13.55 13.85 13.85 14.19
May 12.00 12.80 13.55 13.55 13.85 13.85 14.19
June 12.80 12.80 13.55 13.55 13.85 13.85 14.19
July 12.80 13.55 13.55 13.55 13.85 13.85 14.19
August 12.80 13.55 13.55 13.55 13.85 14.19
September 12.80 13.55 13.55 13.55 13.85 14.19
October 12.80 13.55 13.55 13.85 13.85 14.19
November 12.80 13.55 13.55 13.85 13.85 14.19
December 12.80 13.55 13.55 13.85 13.85 14.19
Barry's Average Rate 12.47 13.18 13.55 13.63 13.85 13.99 14.19
Barry's W-2 Earnings $36,495 $36,525 $37,632 $36,550 $21,199 

*1567
 EXHIBIT A-1
 DOLLAR DIFFERENCES BETWEEN ACTUAL EARNINGS
 AND "WHAT IF" EARNINGS
 HERRING TAYLOR PLANT ROSS PALMS HOMER
 XXX-XX-XXXX XXX-XX-XXXX XXX-XX-XXXX XXX-XX-XXXX XXX-XX-XXXX XXX-XX-XXXX
PLAN YEAR DOE 6/9/80 DOE 9/8/80 DOE 6/9/80 DOE 6/9/80 DOE 9/8/80 DOE 7/7/80
 1983 $ 634.25 $1,304.77 $ 872.79 $ 620.62 $ 823.61 $ 591.58
 1984 2,868.48 5,657.74 4,756.33 2,711.92 2,533.02 2,144.66
 1985 3,105.24 8,149.82 5,553.48 3,232.08 4,259.52 2,515.44
 1986 3,167.40 8,612.88 5,415.72 3,191.28 4,201.68 2,510.76
 1987 3,017.40 8,218.80 5,419.44 3,042.84 4,180.44 2,486.52
 1988 1,180.68 5,764.47 3,575.72 3,091.92 3,767.28 1,828.89
 1989 1,476.80 5,042.62 2,471.07 3,021.64 3,835.81 0.00
 1990 0.00 5,016.92 1,010.76 0.00 1,951.76 0.00
 1991 0.00 2,434.80 0.00 0.00 2,381.60 0.00
 ADDITIONAL CONTRIBUTIONS WHICH WOULD HAVE BEEN MADE
 BASED ON ADDITIONAL "WHAT IF" EARNINGS
Balance 5/15/91
---------------
Cash $ 24.15 $ 150.23 $ 63.37 $ 27.88 $ 68.85 $ 19.09
Common
Stock 47.146 126.498 85.100 54.410 66.896 37.149
Preferred
Stock 0.000 3.572 0.769 0.000 1.388 0.000
Sub-Total
Valuation $3,905.21 $10,857.59 $7,132.11 $4,506.91 $5,689.99 $3,077.20
Deductions -1,000.00
Total $3,905.21 $10,857.59 $6,132.11 $4,506.91 $5,689.99 $3,077.20

NOTES
[1] YEAR BACK PAY AWARD
 1983 $ 4,843
 1984 7,845
 1985 9,413
 1986 9,771
 1987 8,904
 1988 5,776
 1989 6,062
 1990 4,162
 1991 1,187
Subtotal $ 57,963
Deduction -0-
Total Back Pay Award $ 57,963

[2] YEAR BACK PAY AWARD
 1983 $ 2,168
 1984 3,239
 1985 3,482
 1986 3,550
 1987 2,906
 1988 896
 1989 1,269
 1990 -0-
 1991 -0-
Subtotal $ 17,510
Deduction -0-
Total Back Pay Award $ 17,510

[3] YEAR BACK PAY AWARD
 1983 $ 2,421
 1984 3,692
 1985 4,790
 1986 4,793
 1987 5,205
 1988 4,286
 1989 3,068
 1990 2,629
 1991 1,098
Subtotal $ 31,982
Deduction -0-
Total Back Pay Award $ 31,982

[4] YEAR BACK PAY AWARD
 1983 $ 1,674
 1984 2,760
 1985 2,838
 1986 2,897
 1987 2,966
 1988 624
 1989 -0-
 1990 -0-
 1991 -0-
Subtotal $ 13,759
Deduction -0-
Total Back Pay Award $ 13,759

[5] YEAR BACK PAY AWARD
 1983 $ 3,300
 1984 6,023
 1985 6,512
 1986 6,434
 1987 6,276
 1988 3,003
 1989 2,212
 1990 -0-
 1991 -0-
Subtotal $ 33,760
Deduction 10,000
Total Back Pay Award $ 23,760

[6] YEAR BACK PAY AWARD
 1983 $ 2,305
 1984 3,129
 1985 3,636
 1986 3,618
 1987 3,668
 1988 3,553
 1989 2,062
 1990 -0-
 1991 -0-
Subtotal $ 21,971
Deduction -0-
Total Back Pay Award $ 21,971

[7] Section 1821 provides in relevant part:

(b) A witness shall be paid an attendance fee of $30 per day for each day's attendance. A witness shall also be paid the attendance fee for the time necessarily occupied in going to and returning from the place of attendance at the beginning and end of such attendance or at any time during such attendance.
[8] TOTAL ATTORNEY'S FEES
Attorney's fees and reasonable
 expenses: $ 229,062.53
Legal support staff fees and reasonable
 expenses: $ +8,957.81
 ============
 SUBTOTAL: $ 238,020.34
Less previously awarded interim
 attorneys' fees: $ -62,500.00
 ============
 TOTAL: $ 175,520.34